176 Cal.App.4th 1047 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
OLGA RUTTERSCHMIDT et al., Defendants and Appellants.
No. B209568.
Court of Appeals of California, Second District, Division Five.
August 18, 2009.
*1051 David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Olga Rutterschmidt.
Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Helen L. Golay.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

*1052 OPINION
KRIEGLER, J.
The jury found defendants Olga Rutterschmidt and Helen Golay guilty of the first degree murders of Paul Vados and Kenneth McDavid, finding that both murders were committed for financial gain (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(1)).[1] Defendants were also convicted of conspiring to commit the Vados and McDavid murders (§ 182, subd. (a)(1)). The jury made separate special circumstance findings of multiple murders (§ 190.2, subd. (a)(3)) as to both defendants. Defendants received consecutive sentences of life without the possibility of parole for the murders. Sentences of 25 years to life for the conspiracy convictions were stayed pursuant to section 654.
In their timely appeals, defendants contend (1) the trial court violated their Sixth Amendment right to confront adverse witnesses by admitting testimony by Joseph Muto as to the results of laboratory drug analyses performed by analysts under his supervision; (2) admission of post-arrest, custodial statements by defendants while detained together was in violation of the Fourth Amendment because defendants were not timely presented to a federal magistrate pursuant to their federal arrest warrants; (3) the prosecutor engaged in prejudicial misconduct in opening statement and closing argument; and (4) the trial court violated Rutterschmidt's Sixth Amendment right to a unanimous jury and due process by its instruction to the jury upon the seating of an alternate juror after the jury had reached a partial verdict. We affirm.

STATEMENT OF FACTS
Special Agent Robert Brockway of California's Department of Insurance testified as an expert in insurance matters. A "term" life insurance policy is the cheapest type of life insurance to buy. It is effective for a specified term of years and has no investment component. Such policies require the existence of an "insurable interest"that is, a relationship between the insured and the beneficiary based on familial or "blood," a relationship through marriage, or a financial relationship. The purpose of requiring an insurable interest is to prevent a named beneficiary from having the incentive to cause the insured's death. Under California law, term life insurance policies become incontestable after being in force for two years after issuance, assuming all premium payments have been made.[2] Before a policy becomes incontestable, the insurance company can cancel and rescind the policy upon discovery that it was obtained through fraud or misrepresentation. After a two-year period, however, the policy will remain in force even if it had been procured through *1053 deceptive means. A claim that postdates the incontestability period must be paid, unless the insurance carrier can demonstrate the policy was procured by criminal means. Insurers will typically ask whether the person seeking insurance has other policies on the same insured in order to ensure that the particular insured is not overinsured. That is, if a person has a financial worth of $1 million, the insurer will not want to provide insurance out of proportion with that amount.

Paul Vados
Defendants' first victim, Paul Vados, immigrated to the United States from Hungary in 1956. After his wife died in 1985, Vados moved into his daughter Stella's Hollywood residence. Stella lost contact with him in 1995, when he moved to Northern California. Neither defendant had any family relationship with Vados.
From 1997 to his death on November 8, 1999, Vados lived in an apartment on South Fedora Street in Los Angeles. According to the offsite apartment manager, Vados appeared to have no job and typically left the building in the morning and returned drunk in the afternoon. His apartment was filthy. At some point during Vados's tenancy, Rutterschmidt told the manager that she was "in charge of Paul Vados." After Vados's death, Rutterschmidt told the manager she would pick up Vados's belongings.
Norma Ceja was 12 years old when she lived at the South Fedora Street apartment building with her mother, who was the building's onsite manager. Ceja would translate English for her mother. Vados lived alone in one of the apartments. Ceja and her mother would bring food to him whenever he was too drunk to take care of himself. Sometimes Ceja would help bring him home when he was too intoxicated to walk by himself. Rutterschmidt visited Vados approximately twice a month. She claimed to be his sister and would bring him groceries. Ceja or her mother would check on Vados daily. After learning he had died, Rutterschmidt came by and told Ceja's mother to "dump" all of Vados's belongings. Rutterschmidt said that Vados had been run over by a bus or train.
Ceja's mother collected rent from the tenants. Vados paid by money order. Sometimes he delivered it alone and sometimes with Rutterschmidt. When Ceja's mother noticed Vados had been missing for approximately three days, she telephoned Rutterschmidt to tell her. Ceja's mother had seen Rutterschmidt at the apartment in the company of another elderly Caucasian woman.

*1054 A. Discovery of the Body

At 7:00 a.m. on November 8, 1999, Officer Lee Willmon investigated what he assumed was a fatal traffic accident in an alley near 307 North La Brea Avenue in Los Angeles. The accident scene was one mile away from Rutterschmidt's 1776 North Sycamore Avenue residence. It was raining heavily when the officer arrived. Vados's body was lying crosswise in the middle of the alley. He had no wallet and no identification on his person. It appeared that he had been lying on the ground when he was struck by the car. His chest and torso were twisted and crushed, there were abrasions on his nose, and grease on his chin. Vados's clothing was covered with grease in the areas where he suffered injuries. His left hand had abrasions and grease stains consistent with contact with a car's hot oil pan, muffler, or tailpipe. His injuries and the placement of his body were indicative of being run over by a car traveling slowly. There were no glass fragments or any car parts at the scene.
At 10:00 p.m. on November 17, 1999, Officer William Fernandez took a missing person report from defendants at the police station on Wilshire Boulevard. Rutterschmidt gave him the information. According to her, Vados had been last seen on November 5 at 6:00 p.m., at his apartment, when defendants had visited to help pay his rent. Vados's mental condition was "fair and possibly slipping." When they returned five days later, they could not find Vados. Rutterschmidt said she returned after another five days on November 15 and looked into his apartment with the manager. The television had been left on. Rutterschmidt signed the report form, representing herself as being Vados's cousin.
Golay called Officer Willmon on December 3, 1999, saying she was a friend of the victim's family and his "one-time fiancée." She said she was also the friend of Vados's "cousin," Rutterschmidt, who had filed a missing person report on him. The officer, however, would not provide her with an accident report because she was not the victim's next of kin.[3]
Dr. Louis Pena, a forensic pathologist, conducted Vados's autopsy on November 10, 1999. The victim was 73 years old. He died as a result of multiple traumatic injuries, including 48 fractures to his ribs. The trauma to Vados's chest area caused a fatal laceration to his aorta. The pathologist confirmed and expanded upon Officer Willmon's observations of Vados's injuries. The injuries were consistent with having been run over by a car.

*1055 B. Insurance on Vados's Life

Starting in 1997, applications for at least six policies for life insurance or accidental death insurance had been made on behalf of Vados, listing either Golay alone or both defendants as beneficiaries. In the applications and in the claims for benefits, Golay was represented as Vados's fiancée and Rutterschmidt as his cousin.
For instance, an application was made on May 22, 1997, for a $50,000 John Hancock whole life insurance policy on Vados, with defendants listed as beneficiaries. No policy was issued, though, because of the insured's poor medical history. Guarantee Trust Life Insurance Company, however, issued a policy for Vados with defendants as beneficiaries, listing Rutterschmidt's address as the insured's residence. Golay paid $16,724.34 in premiums and was eventually paid $30,318.08 in death benefits. Rutterschmidt was paid $20,212.06.
Mutual of Omaha issued a $25,000 accidental death insurance policy for Vados, with Golay as the sole beneficiary as his supposed fiancée. The insured's residence was listed as 424 Ocean Park Boulevard in Santa Monica, which was Golay's address. The initial premium payment was paid by a check drawn on Vados's account, but the address on the check was Golay's. Golay made a claim for benefits following Vados's November 8, 1999 "accidental death." In her claim, she represented under penalty of perjury that Vados was her fiancé, and that Vados was killed when struck by an automobile while walking at 261 North La Brea Avenue. Golay wrote to the insurance company, enclosing various documents in support of her benefit claim.
A person representing herself as Rutterschmidt telephoned a company representative on March 20, 2000, and said that Vados was her cousin. She added that Golay owed Vados $5,000, and Rutterschmidt wanted to be paid by the insurance company before Golay. Rutterschmidt called back within a few minutes and asked that Golay not be informed of Rutterschmidt's requests. The company initially refused to pay the claim because of suspected fraud, based on the accident being a hit-and-run accident with no witnesses. Golay wrote again on August 16, 2000, to complain about the delay in payment and threatening to sue the insurance company. Golay was eventually paid the $25,000 death benefit on October 4, 2000.
On October 15, 1997, Monumental Life Insurance Company issued a $250,000 group accidental death insurance policy for Vados with defendants as beneficiaries. The insurance was offered to Wells Fargo Bank account holders. Vados had a Wells Fargo account in his name, but "in care of" *1056 Rutterschmidt at her address. It was Golay, however, who made the premium payments. Defendants filed claims for death benefits. Following an interpleader action, defendants received $187,500, with the balance going to Vados's estate and the attorneys who handled the action.
Continental Casualty Insurance Company issued a $250,000 accidental death insurance policy on Vados's life. Beneficiaries were Rutterschmidt as his cousin and Golay as his fiancée. The latter made the premium payments and submitted the claim for death benefits. Defendants each received $65,875 in benefits. American Bankers issued another $250,000 life insurance policy on Vados, with his residence given as Golay's address and defendants as beneficiaries. Golay made the premium payments from a bank account in Vados's name, but under Golay's address and telephone number. Defendants were each paid $63,964.41 in death benefits.
On March 27, 1997, Interstate Assurance Company issued a $50,000 whole life insurance policy on Vados, with Golay's Santa Monica address given as the insured's. Golay was the policy's owner as Vados's "fiancée/caretaker." The policy had a $50,000 accidental death rider in favor of Golay, with Rutterschmidt as contingent beneficiary. On May 3, 1997, the policy was modified to change the contingent beneficiary to Golay's daughter. Golay received $50,416.79 in benefits under the policy.
Golay was the sole beneficiary of an $11,000 whole life insurance policy and $5,000 accidental death policy on Vados, issued by Guarantee Reserve Life Insurance. She made premium payments of $996.84 and received the $16,000 death benefits.
Rutterschmidt was a customer of the Hollywood Rubber Stamp Company during the 1990's. She sometimes referred to herself as Olga Smith on her invoices. She typically ordered signature stamps. Instead of bringing in original signatures as exemplars, Rutterschmidt would have a copy from a document containing the signature. Her chief concern was that the stamp make prints that "look authentic," like an original signature. In 1997, using the surname Smith, she purchased a signature stamp for Vados.
Questioned documents examiner William Leaver examined and tested the signature stamps from Hollywood Rubber Stamp Company; he opined that Vados's signature on the insurance applications had been stamped. He also reviewed examples of Golay's handwriting and opined that she had likely written most of the notations of Vados's identifying information on a Post-it note found in her residence at the time of her arrest.

*1057 Kenneth McDavid

Defendants' second victim, Kenneth McDavid, grew up in Northern California with his parents and siblings. McDavid attended Sacramento High School and Sacramento State University. His sister Sandra Salman last saw him in approximately 1994. She received a telephone message from McDavid in April or early May 2005. At that time, she did not know where he was living. In late November 2005, the police informed her that McDavid had died. Salman had neither seen nor heard of either defendant; neither was related to McDavid.

A. Defendants' Selection of McDavid

Patrick Lamay[4] met McDavid in approximately 2002 at the First Presbyterian Church in Hollywood. Lamay and his girlfriend Amy Matte had recently arrived from Michigan. They were homeless and had been "urban camping" outside the church, which provided them with food. McDavid was also sleeping outside the church because he had no home.[5] Lamay and Matte returned to Michigan.
Sometime afterwards, one or both defendants met McDavid and arranged for him to live in an apartment. Golay rented apartment No. 410 at 1843 North Cherokee Avenue in Hollywood, pursuant to a lease agreement dated September 1, 2002. Golay regularly paid the rent by check, sent by mail and drawn on her account, but she did not live in the unitMcDavid did.
When Lamay and Matte returned to Hollywood in the spring of 2003, they met McDavid at a Starbucks close to the church. McDavid told them he had a place to live on Cherokee and took them to the Golay apartment. Lamay and Matte returned to Michigan again. Lamay and Matte returned in 2004 and met McDavid at the same Starbucks. McDavid invited Lamay to stay with him in the Cherokee apartment in exchange for Lamay's buying food and paying for telephone and cable television service. Lamay did so for three to four months. At some point during that time, Daniel McKelvi, Matte, and another woman moved into the apartment too, with McDavid's approval.
Lamay saw Rutterschmidt at the apartment, talking to McDavid. When she asked if Lamay was living there, McDavid denied it. She responded, "You know our arrangement, and that's why you can't have anybody living here." McDavid later explained that Rutterschmidt paid the rent for him on the *1058 condition that he not allow anyone else to live there with him. Also, McDavid said that Rutterschmidt and Golay asked him to sign a life insurance policy as "an act of good faith," which he did. Lamay asked McDavid whether defendants were his lovers or family. McDavid said they were not. When Lamay next saw Rutterschmidt, she was outside the apartment door "making a fuss" because there were five people living inside the unit, despite her warning. Rutterschmidt let herself inside with an apartment key. McDavid tried to stop her from entering.
Douglas Crapeau lived in the same North Sycamore apartment building as Rutterschmidt. In conversations with him, Rutterschmidt mentioned an acquaintance named Helen Golay. Rutterschmidt told Crapeau that she worked for Golay in the real estate business. Golay had ordered her to evict someone from an apartment, and Rutterschmidt asked Crapeau to help her. She told Crapeau to take a gun because she needed protection from "a violent street person." Crapeau drove her to the apartment on Cherokee where McDavid was staying. They went to the unit together. Crapeau had his gun in his pocket. McDavid was inside the unit alone. Rutterschmidt tugged at Crapeau's arm, telling him to "show him the gun." She pulled the gun out of Crapeau's pocket, but he refused to assist her and went back to his car. Crapeau could see that McDavid posed no threat to Rutterschmidt. The entire incident took less than two minutes.
Some weeks later, Lamay went to the apartment, but could not enter. Rutterschmidt was inside with McDavid and an armed security guard. Eventually, the guard let him in to retrieve his belongings. After placing his belongings in the car, Lamay surreptitiously followed Rutterschmidt down the street on foot as she walked to her cara Honda Civicparked on the next block. Lamay tried to visit McDavid a week or two later. McDavid opened the door for him, but the security guard denied him entry.
The security guard, Jose Luna, testified that while on duty, he wore a black uniform and carried a .40-caliber handgun holstered on his hip. On October 30, 2004, Rutterschmidt hired him for a job at the apartment on Cherokee his instructions were to secure the apartment unit and prevent anyone from entering it. That night, she unlocked the door to the unit for Luna to enter. An older maleMcDavidand a middle-aged couple were inside. When Rutterschmidt angrily told the couple to leave, they picked up some clothes and left the unit, leaving Rutterschmidt inside. Rutterschmidt told Luna to stay inside the apartment and she left. On her orders, Luna stayed there from 1:00 p.m. to 1:00 a.m., for the next few days to a week. Rutterschmidt told Luna that her friend, Golay, was involved with her in the assignment. One of the checks Luna received in payment was drawn on Golay's bank account.
*1059 Danielli Cosgrove, the onsite manager of the apartment building on Cherokee, testified that toward the end of 2004, Rutterschmidt called her to demand that the "homeless people" living in the unit be removed. Cosgrove understood her as referring to Lamay, his girlfriend from Michigan, and others who stayed in the apartment unit with McDavid. When Cosgrove told Rutterschmidt that she needed to talk to the actual tenant, Golay, before doing anything about subtenants, Rutterschmidt became belligerent and began yelling and screaming at her. Cosgrove subsequently spoke to Golay. When Cosgrove explained that it was Golay's responsibility as the tenant to remove subtenants, Golay began to scream at her in the same manner as Rutterschmidt. Over the course of a week, defendants, separately and together, made repeated demands that Cosgrove remove the persons living in the unit with McDavid. They did so at all hours, making demands of Cosgrove and directly to the persons in the unit.
Cosgrove went on vacation. When she returned, she found no one living in the unit. One of the defendants called her and said that Golay had given up her tenancy in the building. It appeared that McDavid had "left in a hurry." There was a lot of trash in the unit and bottles of medicine left behind. Cosgrove saw McDavid on the street in Hollywood. He appeared to be homeless and had personal belongings on his bike.
Business records showed that McDavid stayed in various motels in Hollywood from January through June 12, 2005, nine days before his murder. McDavid stayed at a Hollywood Boulevard motel from January 3 to January 24, 2005. Golay paid for his room. He stayed at a motel on La Brea from February 8 until March 30, 2005. The room was paid for in cash. Records from the Econo Lodge Motel on Sunset Boulevard showed McDavid stayed there for a week beginning on March 30, 2005, and another week beginning on June 12, 2005. McDavid stayed at the Hollywood Studio Inn on Sunset Boulevard from May 17 through May 20, 2005.

B. The Vehicle Used in the McDavid Murder

Mario Medina operated a car dealership on South Vermont Avenue. On January 20, 2004, the dealership sold a silver 1999 Mercury Sable station wagon to Rutterschmidt. She paid $6,000 in cash and said she was buying the car for Hilary Adler, a friend, who needed a car. Rutterschmidt, who was accompanied by another elderly woman, requested that the car be registered to Adler at an address on South Croft Avenue in Los Angeles, rather than the *1060 Encino address on Adler's driver's license. The purchase agreement listed Adler as the new owner. At that time, the license plate number was 4FYR482.[6]
Adler, however, had never met either defendant. She belonged to the Spectrum Club in 2003. In April or May 2003, her purse containing her driver's license and Social Security card was stolen from the locker room. She never lived on Croft and the phone number listed on the purchase agreement was not hers. She owned a Camry at that time; she never owned a Sableand never had someone else buy one for her. Records showed that both Adler and Golay's daughter visited the Spectrum Club in Santa Monica from January 27, 2003, through February 26, 2004.
Special Agent Ted Oehninger of the Federal Bureau of Investigation (FBI) participated in the postarrest search of Rutterschmidt's residence. He found five photocopies of Adler's California driver's license inside an envelope with the notation, "Helen sent pictures of: Hilary Adler," with an Encino residence address, cell phone number, and birth date.
Mei Thompson lived on Fifth Street in Santa Monica. Golay was her neighbor. Thompson had also met Golay's daughter. In late 2004, she complained to the city about trash in the alley, but there was no response. In the spring 2005, she submitted photographs of the problem. The photographs showed that red paint had been splashed on trash cans, the back wall of an apartment, and the silver Sable. Sometime after that, Thompson saw Golay closely inspecting the Sable. Golay typically drove either a Mercedes or a BMW sports utility vehicle.
On January 5, 2005, at 10:52 a.m., Santa Monica Parking Enforcement Officer Brenda Heavens issued a ticket to the Sable, which was parked in an alley near Golay's residence on Fifth. Officer Heavens had responded to a complaint about a vehicle being illegally parked there.
Investigation of the Sable showed that on July 12, 2005, less than a month after McDavid's murder, Officer Lourdes Aguilar issued a warning to the Sable for having been parked at 1037 North Vista Street in Hollywood, within a mile of Rutterschmidt's residence, for more than 72 hours. Five days later, Parking Enforcement Officer Cynthia Serrato issued a citation to the Sable on 1745 North Vista Streetthe same block as McDavid's apartment and within a few blocks of Rutterschmidt's residence. Two days after that, the vehicle received a parking ticket and a citation for expired license plate tags *1061 at 10:56 a.m. on July 19, 2005. It was parked nearby at 1739 North Vista Street, about half a mile from Rutterschmidt's residence. After that, the Sable was impounded.
Jose Quintero bought the Sable at an impound sale on November 17, 2005, from a Hollywood tow yard. He had an oil leak repaired. The partial VIN (vehicle identification number) matched that on the Post-it note found in Golay's Mercedes. Records showed that the Sable had a new license plate, but the prior one matched the partial number found on the Post-it note.

C. The McDavid Murder

On the night of June 21, 2005, Yoram Hassid was playing backgammon with his friends Masoud Khalifian and Behrooz Haverim at Khalifian's furniture store on Westwood Boulevard near Santa Monica Boulevard in Westwood. His car was parked in the alley behind the store. When the gathering broke up at approximately midnight, Hassid walked back to his car. He drove southbound and stopped when he saw something suspicious in the middle of the alley. He backed up, parked, and returned to his friends. Hassid told Khalifian to close the back door because someone was lying down in the alley. At approximately 1:00 a.m., Haverim drove Khalifian down the alley and saw a body lying across the alley, next to a broken bicycle. Khalifian immediately called 9-1-1; the operator suggested they honk the horn to see if the person responded. Haverim did so, but the body did not move. Haverim got out of his vehicle and inspected the body. He noticed that the victim's face was dirty and there was blood on the ground. Paramedics and police were sent to the scene.
Contemporaneous security video of the alley from a copy store and market showed a silver Sable make a left turn into the alley at approximately 11:45 p.m. The Sable stopped and backed up some distance before driving out of the alley. After the vehicle stopped in the alley, 15 feet before it reached the location where McDavid was initially struck, the headlights went out. The body was found 10 feet farther down the alley.
According to records from Automobile Club of America (AAA), Golay made a towing request at 11:51 p.m. on that night for a silver Sable.[7] At 12:30 a.m., Brent-Air Towing responded to a Chevron gas station on the corner of Santa Monica Boulevard and Westwood Boulevard and towed the car to a Santa Monica location. Luis Jaimes was the Brent-Air Towing driver who responded. The Sable's driver was an elderly female. She sat with him in the truck, while he towed the Sable to a location near Ocean Boulevard *1062 and Sixth Street in Santa Monica. At 1:00 a.m., a call to Rutterschmidt's cell phone was made from the same cell phone used to make the AAA request. The caller was in Santa Monica at the time. A return call from Rutterschmidt's cell phone was placed a few minutes later.
A postarrest inspection of the Sable on June 6, 2006, showed red paint on the left front wheel. The Sable's fuel line had been illegally repaired by affixing a hose clamp; a broken fuel line will cause the car's engine to stop. Testing was done to show that the Sable would be able to coast down the alley to the Chevron station without use of its engine. Additionally, DNA evidence was collected from the Sable's undercarriage, including samples of presumptive blood, biological tissue, and hair. Criminalist Stephanie McLean found the three samples matched McDavid's DNA.
The accident scene was not typical of a hit-and-run accident. There was no glass debris around the victim, as would typically be the case when a person is struck by a car. Nor were there any signs of damage to the bicycle, although its front wheel had been removed and was lying underneath the bicycle. There was no damage or scrapes to the bike helmetin short, there was no indication that it had been involved in a traffic accident. Rutterschmidt subsequently called Detective Brent Johnson to request a copy of the traffic collision report. She represented herself as being a relative of the victim.
Deputy Medical Examiner Solomon Riley concluded that McDavid's death was caused by multiple blunt force trauma to his upper body. His chest and shoulders had been crushed. He had also suffered abrasions on two parallel tracks across his body.
A toxicology analysis showed the presence of alcohol, along with sedatives, in McDavid's blood. He tested positive for alcohol, at 0.08 grams percent, above the legal limit for driving. McDavid's blood tested positive for a high level of the sedative zolpidem (Ambien) at 0.13 micrograms per milliliter of blood, which a person would reach within one or two hours after the drug put him or her to sleep. There was also hydrocodone (Vicodin) at 0.09 micrograms, which was marginally above the therapeutic level for those experiencing great pain. Additional analysis showed positive results for the epilepsy drug topiramate (Topamax). That drug can also be used to relieve anxiety and as a sleep aidit makes a person drowsy and confused. The combination of those drugs can put a person to sleep.

D. Insurance Policies

From November 2002 through March 2003, defendants separately and together submitted 17 applications for life insurance on McDavid. Thirteen *1063 policies were issued for a total of $3,700,040. Golay received $1,540,767.05 in benefit payments; Rutterschmidt received $674,571.89. Golay paid most of the premiums. She was the sole beneficiary on eight policies. Rutterschmidt was the sole beneficiary on policies from Globe Life Insurance Company and Mutual of Omaha; she paid the premiums on those.
Defendants were beneficiaries of two policies issued by Mutual of New York (MONY) insurance company. Rutterschmidt telephoned MONY's financial advisor Eric Reataza telling him she and her partner wanted to buy life insurance on their business partner, McDavid, to protect their business investment. He sent her an application because she said they did not want to meet personally. The insurance application he subsequently received listed Golay as Rutterschmidt's partner and McDavid as the insured. Because Rutterschmidt did not want to meet with any agent personally, the application was processed by mail. Reataza never met or spoke to McDavid. He processed a $500,000 10-year term life policy as requested.
Rutterschmidt provided the personal information concerning McDavid. As his residence, she listed her apartment address on North Sycamore. When the application was returned from Rutterschmidt, it contained McDavid's information, including his supposed annual earnings of $65,000. It also represented that no other insurance had been taken on McDavid. The application appeared to have been signed by McDavid. Reataza had Rutterschmidt complete a new application because he had previously sent her the wrong one. When submitted, the new application contained the same terms and information, but Rutterschmidt added that the beneficiary and terms were to be irrevocable and that she and Golay were to share equally in the proceeds. Defendants signed their names as the policy's owners.
In July 2003, Rutterschmidt telephoned Reataza to obtain another $500,000 life insurance policy on McDavid. He completed an application for that policy with the same information she had previously provided. The second policy was issued on the same terms as the first. During the application process on the second policy, Golay telephoned Reataza to make sure that the policy's owners and beneficiaries could not be changed. Golay told Reataza that she was McDavid's fiancée. Golay made the premium payments.
Golay filed benefit claims under the policies. However, after conducting an investigation, MONY denied the claims. The December 8, 2005 denial letter to defendants explained that MONY had rescinded the policies. The premiums were returned with interest to Golay. According to MONY, the claims were denied on the ground that there had never been an insurable interest. Defendants had represented that they were investment partners in a nonexistent company called HKO Associates. In addition, MONY determined that McDavid did not have an income of $65,000 as had been represented.
*1064 On May 2, 2006, Attorney Joel Cohen received a telephone call from Rutterschmidt, as a prospective client. She sought advice about suing MONY to recover the benefits under the two insurance policies, asserting that the insured was a screenwriter and business partner. She also said the other beneficiary, Golay, was her partner and the insured's fiancée. In that initial call or in a subsequent meeting, Rutterschmidt said that she was the insured's "distant cousin." Rutterschmidt met Cohen and his partner, Bill Shernoff, in their Beverly Hills office on May 8, 2006. Among the letters Rutterschmidt brought to the meeting were the MONY denial letter and a partnership agreement for a real estate acquisition business. As to the latter, Rutterschmidt told the lawyers that it was an incorrect version because the insured was a screenwriter whom she and Golay had supported with the goal of sharing in the proceeds of any successful screenplay he might write.
Cohen reviewed the denial letter and explained that MONY's investigation had found the business partnership did not exist and McDavid's income had been misstated, based on tax returns showing his income in recent years was approximately $40 and $200. Rutterschmidt expressed her surprise because she believed the two-year incontestability period had passed. Cohen responded that the requirement of an insurable interest was independent of the incontestability provision. Rutterschmidt queried, "What if" she were McDavid's cousin or fiancée? The lawyers responded that they needed to know the facts, not "what if's." Rutterschmidt insisted that she wanted their firm to file a lawsuit, and said she would give them "full authority to say whatever was necessary to make it a successful lawsuit."
Two days later, Rutterschmidt met the attorneys again and brought additional documents, including one that purported to be a partnership agreement, which designated the purpose of the business venture as profit sharing "from the movie and television scripts/manuscripts of Mr. Kenneth McDavid." Rutterschmidt asked why she could not represent that she was McDavid's fiancéeadding that she and Golay had received benefits under a different insurance policy "where Miss Golay had said the same thing." Again, she requested the law firm file a lawsuit to recover the insurance benefits, repeating that she would give the lawyers "full authority to do whatever was necessary." Cohen and his firm declined to represent Rutterschmidt.
Cheryl Gushard, a special investigator for the Mutual of Omaha Insurance Company testified concerning a term life insurance policy for McDavid, naming Rutterschmidt as the sole beneficiary. Her residence address had been given for McDavid's. The policy application of February 20, 2003, appeared to have been signed by McDavid and it stated that he was Rutterschmidt's associate and nephew. Rutterschmidt made the initial premium payment by a check drawn on her bank account, but the policy lapsed when no additional *1065 payments were made. On March 25, 2003, the insurance company received a telephone call from a person calling herself "Olga Smith" and requesting cancellation. The caller was informed that McDavid, as the policy's owner, would have to make that request. No such request was ever made.
Globe Life and Accident Insurance Company issued a $20,000 life insurance policy for McDavid in March 2003. In the application, the address given for him was that of Rutterschmidt on North Sycamore. She was the named beneficiary, with a claimed relationship as McDavid's associate and cousin. The application appeared to have been signed by McDavid. The initial and subsequent premium payments were drawn on Rutterschmidt's bank account. She submitted a claim form for death benefits on September 7, 2005. In the preceding month, she had sent letters to the company seeking reimbursement for overpayment of premiums.
In reviewing the claim, insurance company personnel noticed irregularities, including the use of "white out" to alter McDavid's certified death certificate. Rutterschmidt represented that she had made that alteration in order to cover up Golay's address because Rutterschmidt did not want the benefits check sent to that address. Rutterschmidt repeatedly represented herself as being McDavid's cousin. The company eventually paid her the $20,000 death benefit plus a refund for overpayment of premiums.
A separate $20,000 Globe Life policy was issued on McDavid's life with Golay as the beneficiary as his fiancée, with the insured's residence being her Santa Monica address. Premium payments were drawn on Golay's bank account. She submitted a claim for payment of death benefits, but the insurance company denied her claim, despite a demand letter from Golay, which included the threat of a lawsuit.
In September 2003, United Investors Life issued a $100,000 term life insurance policy on McDavid's life with Golay as the beneficiary. The application listed her address for the insured's residence and represented that she was his fiancée, with his occupation being an "investor." The application stated that a telephone interview might be required and requested that the applicant provide a telephone number. Golay's number was given. A company representative called that number and unsuccessfully attempted to interview McDavid on September 18. On September 29, a recorded telephonic interview took place. The recording was played to the jury. In the interview, Golay initially speaks to the interviewer and purports to have McDavid come on the line to answer the interviewer's questionsmainly confirming the information submitted on the application and answering health-related questions. Both Lamay and McDavid's sister testified that the voice of the person on the telephonic interview did not match McDavid's. On *1066 September 21, 2005, Golay made a claim for payment of the death benefits as the insured's fiancée. The company refused to pay, finding discrepancies in the claim documents that needed to be resolved. Golay's demand letter was unavailing.
On February 13, 2003, Golay telephoned Andrew Ziskin of the AXA Investment Network about purchasing a 10-year term life insurance policy. She did not want to meet in person. After receiving price quotations, she submitted an application dated February 19, 2003, for a $500,000 Empire General policy on the life of McDavid, listing him as a real estate investor residing at her home address in Santa Monica. She and Rutterschmidt were designated as the irrevocable beneficiaries and listed as investment partners. Ziskin noted that McDavid's signature appeared to be a stamp, so he telephoned Golay and requested that McDavid provide an original signature next to the stamped onewhich apparently was done. In response to Ziskin's questions, Golay said that she was McDavid's fiancée, Rutterschmidt was his cousin, and they were all business partners. Golay represented that McDavid's annual income was $72,000 and his net financial worth was $700,000. Golay paid the premiums. A claim for payment of the death benefits was submitted on August 13, 2005. Golay and Rutterschmidt were each paid approximately $251,575 on August 30, 2005.
On February 27, 2004, AARP Group Life issued a $25,000 term policy on McDavid's life, with Golay as the sole beneficiary as his fiancée. It was later amended to increase the coverage to $75,000. Golay paid the premiums and submitted the benefits claim, which was paid to her in the amount of $75,796.51.
Jody Resnick was the agent for AAA Insurance Company who processed an application for an $800,000 10-year term life insurance policy on McDavid. The application listed the insured as a real estate investor and Golay as sole beneficiary as his fiancée. The contingent beneficiaries were Golay's daughters. The premium was paid on Golay's credit card account. During the application process, Golay said that McDavid lived at her Santa Monica residence. The policy was issued on January 17, 2003. The contingent beneficiaries were eliminated from the policy on September 15, 2003. AAA paid $810,556.39 in death benefits to Golay.
Ganae Smith was a supervisor with AAA Insurance Company. She found it unusual that the claim for benefits was not submitted until June 22, 2005. She checked the AAA roadside service records for Golay and found she had requested towing within a day of the insured's death. She referred that information to an investigator for the Department of Insurance. Smith telephoned Golay concerning her relationship with the insured. Golay said she *1067 had planned to marry McDavid in December of that year. Smith also discovered that Golay had applied for another $800,000 life insurance policy on McDavid and one for a person named James Covington. The Covington application was made on April 30, 2002, listing his address as the same one used for McDavidGolay's Santa Monica residence.
Garden State Life Insurance Company issued a $100,000 term life insurance policy for McDavid on April 8, 2003. Once again, the address given for McDavid was Golay's Santa Monica residence. He was represented as being a self-employed investor, with an income between $50,000 and $99,000. Golay was the sole beneficiary, who claimed to be his fiancée. She paid the premiums.[8] Golay submitted a request for payment of death benefits on September 19, 2005, but it was not paid. The insurer wrote to inform her that payment was delayed pending an investigation. She responded with her own letter demanding payment on the ground that the two-year contestability period had been satisfied. She later sued the insurer for payment.
Great West Life Annuity Insurance Company issued a $150,000 term life insurance policy for McDavid with Golay as sole beneficiary. She paid the premiums. As part of the application process, she submitted an affidavit representing that she was McDavid's fiancée. The claim was not paid, despite Golay's demand and threat of lawsuit, because the insurer found indications that the application was fraudulent, such as stamped signatures and other insurance policies on McDavid.
Defendants obtained an $800,000 term life insurance policy on McDavid from First Penn Pacific Insurance. The application represented that they were cousins and partners, and that McDavid had an annual income of $105,000 and a net worth of $1,250,000. The insured's signature on the application was stamped. Golay made the premium payments. Both defendants submitted claims for payment and were paid approximately $402,000 each.
Golay was the sole beneficiary, as fiancée, of a $150,000 term life insurance policy on McDavid from American Life Insurance Company of New York, issued on March 8, 2005. She paid the premiums and submitted a letter demanding payment of the death benefits on December 12, 2005. The policy was within the period of contestability, and the company denied payment due to irregularities, including discovery that the application falsely stated no other insurance policies had been taken on the insured's life. The insurance company also determined Golay had no insurable interest.
*1068 As stated above, Rutterschmidt obtained signature stamps from the Hollywood Rubber Stamp Company. She purchased signature stamps for McDavid and Vados. Questioned documents examiner Leaver reviewed McDavid's signature card at one of the Hollywood motels and other signature exemplars, including a driver's license application. He examined exemplars of defendants' signatures and handwriting from various documents, including insurance documents they submitted in connection with their benefit claims. He also tested the signature stamps from the Hollywood Rubber Stamp Company. Leaver opined that the writings concerning Adler found in the postarrest search were probably written by the same person who wrote the Golay exemplars, and that the signature on the MONY insurance policy application was made by the self-inking stamp obtained by Rutterschmidt.

Defendants' Arrests and Residence Searches
Defendants, who were in their mid-70's, were arrested and their residences were searched on May 18, 2006. A further search of Golay's Santa Monica residence on June 9, 2006, led to the seizure of various prescription drug bottles, including a bottle of Ambien and two bottles of Vicodin (hydrocodone) prescribed to Golay, and bottles of venlafaxine and temazepam prescribed to Golay's daughter. The Ambien bottle contained no pills, but 7.42 grams of powdered temazepam and smaller amounts of hydrocodone and venlafaxine. Also recovered was a Post-it note on a movie ticket with Vados's date of birth, Social Security number, the names of his parents, and his California identification number.
A search of Golay's Mercedes recovered a day planner with a Post-it note on one page with a partial license plate number (FYR 482) written on it, along with a partial vehicle identification number. The other side of that page listed Rutterschmidt's name, along with a date of birth, Social Security number, her North Sycamore apartment address, telephone number, and driver's license number. There was another notation of the apartment manager's name, office, and cell phone numbers of McDavid's residence on Cherokee.
Defendants were placed in the same room at the police station and surreptitiously tape-recorded. According to Detective Kilcoyne, defendants had been told that they had been charged with mail fraud and were under investigation for murder. As soon as Detective Kilcoyne left them alone, Rutterschmidt blamed Golay, saying it was her fault: "You cannot make that many insurances. It's on your name, only." Golay responded that she did not want to talk to Rutterschmidt, but the latter told her, "you have to because you did all the insurances extra. That's what raised the suspicion. You can't do that. Stupidity." Golay answered: "All they're after is mail fraud. It is no *1069 mail fraud involved." As the discussion continued, Golay reasserted that the insurance companies were complaining against them for "mail fraud""They have nothing else." They discussed suing the insurance companies to get the benefits that had been denied. At one point, while discussing the circumstances of their arrests and the information in the search warrant affidavit, Rutterschmidt said: "That is very serious (inaudible) everything dragged into Paul [Vados]." Rutterschmidt again blamed Golay for "mak[ing] all these God damn extra insurances . . . . You were greedy. That's the problem. That's why I get angry. We had no problem with the relationship. You pay me and be nice and don't make extra things. I was doing everything for you." She pressed Golay to admit it was her fault for obtaining three insurance policies on her own, including those from AAA and Garden State. Golay admitted getting the policies, adding that she paid for them.
As the conversation continued, Rutterschmidt expressed her regret for not having fled "back to Europe" the month before. At another point, Golay told Rutterschmidt: "Now, you have to realize the bottom line i[s] this. Whatever Kenneth wanted, and you have to remember that, whatever Kenneth wanted to do, Kenneth wanted all this." Rutterschmidt agreed, adding that "we supported him."

Jimmy Covington
The prosecution presented evidence of defendants' unsuccessful effort to find a third victimCovington. In 2002, Covington was homeless and living on the streets in Hollywood. He periodically received meals and assistance at the First Presbyterian Church.[9] Covington was outside a building on El Centro Avenue when Rutterschmidt came up to him and asked whether he was homeless. He said he was. She told him that she worked with homeless people and could help him get benefits and find him a temporary place to stay if he filled out some forms. Covington said he was interested, and Rutterschmidt explained that if he completed some paperwork, giving information about his background and any disabilities, she could arrange for him to receive some money and stay in the building on El Centro. She took him inside to an office with a futon in the back room and told him that he could stay there temporarily while the paperwork was prepared, so long as he was quiet and kept the room clean.[10] Rutterschmidt gave him the access codes for entering the building and office. At some point, Rutterschmidt told him that she worked with a partner who was her boss.
*1070 Covington stayed there for approximately a week, filling out some pre-printed forms and answering Rutterschmidt's questions concerning his homelessness. He also provided her with his Social Security number, date of birth, family history, and information regarding his health problems. He was 45 years old at the time. She seemed genuinely concerned about him. However, when Rutterschmidt asked for personal background information such as his mother's maiden name, Covington demurred. On at least two occasions, Rutterschmidt unlocked the door without knocking and entered the office where he was sleeping at 3:00 a.m. to check on him. In that week, she bought him a hamburger and gave him $15. He once saw Rutterschmidt outside the building talking to another elderly woman.
Covington stopped staying at the building because Rutterschmidt became angry and "verbally abusive" to him because he refused to complete the paperwork Rutterschmidt gave him. He never gave her permission to apply for an insurance policy on his life and never knew she had done so. However, Golay applied for an $800,000 term life insurance policy on Covington on April 30, 2002, listing Golay's Santa Monica address as Covington's residence. The application also listed a work address for Covington in El Centro. A medical examination was scheduled for May 4, 2002, but never took place.

Defense
Golay did not testify, but presented evidence to support the theory that it was her daughter who murdered McDavid. The defense mainly relied on evidence in the prosecution case as to Golay's daughter's potential involvement, such as her Spectrum Club membership at the time of the Adler purse theft and that the cell phone used just after the McDavid murder was registered in her name. Golay presented evidence that AAA service providers would assist members who did not have membership cards with them at the time of the service request, if the caller provided the member's name and address.

DISCUSSION

Confrontation Clause
(1) Defendants contend the admission of testimony by Muto, the chief laboratory director of the Los Angeles County Department of Coroner, as to the presence and quantity of various prescription drugs and alcohol found in McDavid's blood samples violated their right to confront adverse witnesses under the Sixth Amendment, as applied in Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford) and most recently in Melendez-Diaz v. Massachusettes (2009) 557 U.S. ___ [174 L.Ed.2d 314, *1071 129 S.Ct. 2527] (Melendez-Diaz).[11] As we explain, Rutterschmidt forfeited her claim by failing to object to the testimony below. Moreover, there was no confrontation clause violation. The written reports containing the testing results were not introduced into evidence. Instead, the prosecution witness, an expert who had personally reviewed the reports and was fully qualified to interpret and explain them, offered live testimony subject to cross-examination as to the results. In any event, any error would have been harmless beyond a reasonable doubt. Wholly apart from the drug testimony, there was overwhelming evidence that McDavid's killing was not accidental, but the result of a murder scheme intended to make the killing appear to be an accident.
Muto offered expert testimony as to the results of the toxicology analyses performed on samples of McDavid's blood. The testing was done under his supervision, and he signed the two reports containing the testing results. As the chief laboratory director, Muto had degrees and a license in toxicology and was a certified blood-alcohol analyst. He explained that in conducting toxicology analyses, criminalists in the laboratory performed tests on samples of biological material taken during autopsies. Four laboratory criminalists under his supervision performed the testing on McDavid's samples. Muto was familiar with all the criminalists in the laboratory. With regard to every toxicology report issued from his laboratory, he conducted either an administrative review or a peer review. In the former, before certifying the testing results, he would review the entire case to verify compliance with proper procedures and scientific standards, including quality control. As a peer reviewer, he acted as a second chemical analyst to ensure a sufficient informational foundation for the original analyst's conclusions. All final reports go out under his signature, reflecting that he examined the documentation and analytical work comprising the final report.
When the prosecution sought to have Muto testify about the toxicology results, as contained in the two reports under Muto's signature, counsel for Golay objected to Muto's testimony on the ground that the Sixth Amendment's confrontation clause required that the analysts who personally tested the samples testify. The prosecution argued that Muto's actions in reviewing the other analysts' testing procedures and results gave him constitutionally adequate "personal knowledge" of the results, and that the reports were admissible through the business records exception to the hearsay rule (Evid. Code, § 1271). The trial court overruled the objection. The reports themselves, however, were not introduced or admitted as evidence.
*1072 Muto explained that in performing each toxicology test, the testing instrument itself would generate the analytical data. The analyst who did each test was responsible for noting that the results corresponded to the sample received from a particular coroner's case. In McDavid's case, each of the four analysts who tested the coroner's samples prepared a contemporaneous preliminary report with the testing results. Those reports were then subject to peer review. Following peer review and approval, the laboratory's clerical staff entered the data into a computer program and generated two final reports, one dated July 13, 2005, and one dated July 21, 2006.
Muto performed his administrative review of the July 13 report. After verifying that each analysis had been peer reviewed, Muto personally verified whether the analyses were performed according to laboratory procedures and standards, before checking the reports for accuracy and for clerical errors. After doing so, he signed the final report. The July 13 report showed that McDavid tested positive for alcohol, Zolpidem (Ambien), and hydrocodone (Vicodin). The same testing procedures were followed with regard to the July 21 report; however, it was another supervising criminalist who performed the administrative review, based on testing performed by another criminalist. Again, Golay's confrontation clause objection was overruled. That testing showed positive results for topiramate (Topamax). On redirect examination, Muto testified that he independently reviewed both final reports and found no mistakes in either.
To place the drug testimony in context, Dr. Spiehler, an expert pharmacologist, testified that the combination of those drugs in a person's blood system would have likely put him or her to sleep. Her testimony is not challenged on appeal. The search of Golay's residence recovered various prescription drug bottles, including a bottle of Ambien and two bottles of Vicodin prescribed to Golay, along with bottles of venlafaxine and temazepam prescribed to Golay's daughter. The Ambien bottle contained no pills, but 7.42 grams of powdered temazepam and smaller amounts of hydrocodone and venlafaxine.
Rutterschmidt's claim fails. By failing to interpose a timely and specific objection, Rutterschmidt failed to preserve her confrontation claim for appeal. (E.g., People v. Burgener (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1] [a claim based on a purported violation of the confrontation clause must be timely asserted at trial or it is waived on appeal].) Rutterschmidt attempts to avoid forfeiture by relying on the futility exception delineated in People v. Hill (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673]. That opinion, however, addressed an "extreme case" where the trial court failed to take action to restrain the prosecutor's repeated misconduct leading to a "`poisonous'" trial atmosphere. (People v. Riel (2000) 22 Cal.4th 1153, 1212 [96 Cal.Rptr.2d 1, 998 P.2d 969], quoting People v. Hill, supra, at p. 821.) *1073 Nothing remotely similar occurred in defendants' trial. At no time did the court intimate any reluctance to entertain objections or to discuss them at sidebar. Indeed, given that codefendants' interests were not identical, Rutterschmidt's failure to object may well have been tactical. As in Riel, under these circumstances, "[t]he normal rule requiring an objection applies here, not the unusual one applied to the extreme circumstances of People v. Hill, supra, 17 Cal.4th 800. This issue is, accordingly, not cognizable" in regards to Rutterschmidt.[12] (People v. Riel, supra, at p. 1213; see People v. Wilson (2008) 44 Cal.4th 758, 793 [80 Cal.Rptr.3d 211, 187 P.3d 1041].)
(2) Because Golay preserved the issue for appellate purposes, we turn to the merits of the claim. In Crawford, supra, 541 U.S. 36, the United States Supreme Court held that the admission of hearsay that is testimonial in nature constitutes a violation of the Sixth Amendment right of confrontation where the declarant is unavailable to testify at trial and the defendant had no prior opportunity to cross-examine the declarant. (Crawford, at p. 68.) The Crawford court "declined to definitively state what constitutes a `testimonial' statement for purposes of its discussion but observed: `Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalentthat is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," [citation]; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," [citation]; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" [citation].'" (People v. Geier (2007) 41 Cal.4th 555, 597-598 [61 Cal.Rptr.3d 580, 161 P.3d 104] (Geier), quoting Crawford, supra, 541 U.S. at pp. 51-52.)
(3) There is no federal Supreme Court or California authority for the proposition that Crawford precludes a prosecution scientific expert from testifying as to an opinion in reliance upon another scientist's report. To the contrary, as the parties agree, the California Supreme Court rejected a closely analogous argument in Geier. There, the defendant contended the confrontation clause precluded the prosecution's DNA expert from testifying "about the DNA analysis that resulted in the match between defendant's DNA and DNA extracted from the vaginal swabs on the grounds that [the DNA expert] `didn't actually run the tests herself.'" (Geier, supra, 41 Cal.4th *1074 at p. 596.) The Geier court rejected the argument that Crawford mandated the testing results could be admitted only through testimony by the scientist who personally performed the DNA testing.
As Geier explained, for Sixth Amendment confrontation purposes, opinion testimony by a scientific expert in reliance upon a report containing data obtained by another scientist is not the equivalent of the admission of hearsay contained in the report itself. Geier made the critical distinction between the scientific data in the report (which document was not admitted) and the expert's live opinion testimony drawn from those data: "[The nontestifying scientist's] report and notes were generated as part of a standardized scientific protocol that she conducted pursuant to her employment at Cellmark. While the prosecutor undoubtedly hired Cellmark in the hope of obtaining evidence against defendant, [the scientist] conducted her analysis, and made her notes and report, as part of her job, not in order to incriminate defendant. Moreover, to the extent [the scientist's] notes, forms and report merely recount the procedures she used to analyze the DNA samples, they are not themselves accusatory, as DNA analysis can lead to either incriminatory or exculpatory results. Finally, the accusatory opinions in this casethat defendant's DNA matched that taken from the victim's vagina and that such a result was very unlikely unless defendant was the donorwere reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying witness, [the DNA expert]." (Geier, supra, 41 Cal.4th at p. 607.)
The nature and circumstances of Muto's expert testimony cannot be meaningfully distinguished from that found to comport with Crawford by our Supreme Court in Geier. In both cases, the underlying scientific testing was performed by an analyst supervised by the prosecution expert, who signed the report. (Geier, supra, 41 Cal.4th at pp. 594-596.) Most critically, however, the report itself was not admitted in evidence. Rather, both the DNA expert in Geier and Muto relied upon the data contained in the report to formulate their opinions, and they were subject to cross-examination as to those opinions and the bases upon which they were formed. Here, Muto testified that his review of the data supported the opinion that McDavid's blood contained specific quantities of alcohol and three prescription drugs. From the trial record, it is clear that Muto was qualified to testify as to the nature of the laboratory testing both generally and as was done in McDavid's case. Indeed, he was responsible for verifying that testing for accuracy and compliance with testing protocol.
(4) Golay, however, argues that Geier's holding and rationale have been rendered obsolete by the federal Supreme Court's recent holding in Melendez-Diaz, supra, 557 U.S. ___ [129 S.Ct. 2527]. We disagree. In *1075 Melendez-Diaz, the defendant was charged with distributing and trafficking cocaine. To prove the substance found by police was cocaine, the prosecution "submitted three `certificates of analysis' showing the results of the forensic analysis performed on the seized substances. The certificates reported the weight of the seized bags and stated that the bags `[h]a[ve] been examined with the following results: The substance was found to contain: Cocaine.' [Citation.] The certificates were sworn to before a notary public by analysts... as required under Massachusetts law."[13] (557 U.S. at p. ___ [129 S.Ct. at p. 2531].) Indeed, that state's law authorized the use of such affidavits to provide prima facie evidence of the analyzed substance's composition, quality, and net weight. (Id. at p. ___ [129 S.Ct. at p. 2531].) According to Melendez-Diaz, under such circumstanceswhere the prosecution proved an element of the offense by a sworn certificate, rather than by live testimony at trial (or a showing of witness unavailability and the prior opportunity for cross-examination)the admission of the certificates amounted to error under a straightforward application of Crawford's holding: "The Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of-court affidavits ...." (Id. at p. ___ [129 S.Ct. at p. 2542].)
Here, in contrast, the toxicological findings were not proved by means of an affidavit. As we have shown, Muto testified as a qualified expert, subject to cross-examination, that his review of data obtained under his supervision supported his conclusion as to the presence of alcohol and drugs in biological samples taken from McDavid's body. The Melendez-Diaz decision did not reach the question of whether such expert testimony runs afoul of Crawford. Indeed, the lead opinion speaks for a court majority only on the narrow basis set forth in Justice Thomas's concurring opinion"that `the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' [Citations.]" (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2543] (conc. opn. of Thomas, J.).) Accordingly, the testimony challenged by defendant Golay does not fall within the Melendez-Diaz majority's holding.
(5) It is well established in this state that expert testimony may "be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions." (People v. Gardeley (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].) "So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily inadmissible can *1076 form the proper basis for an expert's opinion testimony." (Ibid., citing In re Fields (1990) 51 Cal.3d 1063, 1070 [275 Cal.Rptr. 384, 800 P.2d 862] [expert witness can base "an opinion on reliable hearsay, including out-of-court declarations of other persons"].) "And because Evidence Code section 802 allows an expert witness to `state on direct examination the reasons for his opinion and the matter ... upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (People v. Gardeley, supra, at p. 618; see Geier, supra, 41 Cal.4th at p. 608, fn. 13 ["As an expert witness, [the DNA expert] was free to rely on [the scientist's] report in forming her own opinions regarding the DNA match."]; People v. Campos (1995) 32 Cal.App.4th 304, 308 [38 Cal.Rptr.2d 113] ["On direct examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion."].)
The Federal Rules of Evidence are in accord. Rule 703 of the Federal Rules of Evidence (28 U.S.C.) provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." (See also, e.g., U.S. v. Richardson (8th Cir. 2008) 537 F.3d 951, 960 [no confrontation clause violation where DNA expert testified as to her conclusions based on her review of DNA tests conducted by another scientist, even though other scientist did not testify, where the expert testified about her own conclusions and was subject to cross-examination].)
(6) Again, the fact that the report itself was not admitted at defendants' trial is crucial for confrontation clause purposes because there can be no violation of a defendant's confrontation rights where the challenged statement was not admitted for its truth. (Tennessee v. Street (1985) 471 U.S. 409, 414 [85 L.Ed.2d 425, 105 S.Ct. 2078]; Crawford, supra, 541 U.S. at p. 59, fn. 9 ["The [confrontation c]lause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."].)
Even assuming Muto's reliance on his supervisees' data violated Golay's Sixth Amendment rights under Crawford and Melendez-Diaz, any error was harmless. "Confrontation clause violations are subject to federal harmless-error analysis under Chapman v. California (1967) 386 U.S. 18, 24 *1077 [17 L.Ed.2d 705, 87 S.Ct. 824]. (Delaware v. Van Arsdall (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 106 S.Ct. 1431].) `Since Chapman, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' (Ibid.) The harmless error inquiry asks: `Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' (Neder v. United States (1999) 527 U.S. 1, 18 [144 L.Ed.2d 35, 119 S.Ct. 1827].)" (Geier, supra, 41 Cal.4th at p. 608.) Here, as in Geier, "the answer is yes." (Ibid.)
Golay argues the evidence that prescription sedatives found in McDavid's blood system matched those found in her residence was crucial to proving McDavid was murdered, rather than killed accidentally. While it is certainly true that the drug evidence provided strong evidence as to her involvement in the murder plot, that evidence was hardly necessary to disprove an accidental death hypothesis. Without any reference to the drugs, the prosecution established beyond a reasonable doubt that McDavid died under highly suspicious circumstances, inconsistent with a typical traffic accident; the circumstances were almost identical to those surrounding Vados's death. Both McDavid and Vados had been insured by defendants with no legitimate basis for doing soand defendants' only interest in those insurance policies was for their victims to suffer untimely deaths. Further, the Sable used to kill McDavid was purchased by defendants and parked next to Golay's home, and a person representing herself as Golay called AAA for roadside assistance for that vehicle immediately after the killing. The notion that any reasonable juror could find McDavid fortuitously was found lying across an alley to be fatally crushed by defendants' car miles from the Hollywood motels where defendants were having him stay would strain credulity well past its breaking point.

Fourth Amendment Presentment Requirement
Defendants contend admission of their recorded statements to each other, made in custody following their arrest pursuant to a federal warrant, violated rule 5 of the Federal Rules of Criminal Procedure (18 U.S.C.)[14] and the Fourth Amendment because local and federal authorities failed to secure a prompt determination of probable cause before a federal magistrate, but instead colluded to keep them in custody for the purpose of obtaining inculpatory statements as to potential state law charges. The claim fails not only because the federal procedural requirements on which they base their claim did not *1078 apply to the underlying state prosecution, but because there was no violation of the Fourth Amendment's guarantee of a timely judicial determination of probable cause as a prerequisite to detention. Moreover, the record provides substantial evidentiary support for the trial court's finding of no improper collusion by state and federal officers.
The evidence at the suppression hearing showed that while the Los Angeles Police Department (LAPD) was investigating defendants for murder, the FBI was pursuing a mail fraud investigation of defendants. On May 18, 2006, at 7:00 a.m., pursuant to a joint FBI-LAPD operation, defendants were arrested at their residences on federal charges under a federal warrant, and their residences were searched pursuant to federal search warrants. At approximately 10:00 a.m., defendants were separately transported by LAPD officers to Parker Center. While there, defendants refused to be interviewed by federal and state agents. With the knowledge of the FBI agents, the LAPD detectives placed defendants together in an interview room equipped with hidden audio and video recording devices. Detective Kilcoyne's purpose in doing so was to record any inculpatory statements defendants might make to each other. From the perspective of the FBI agents, however, defendants were being held at Parker Center in federal custody while waiting for federal agents to transport them for federal arraignment. Defendants were eventually transported by United States Marshals and presented to a federal magistrate for arraignment on federal charges at approximately 3:00 p.m., within 24 hours of their arrests.[15]
Golay, joined by Rutterschmidt, moved to suppress the statements made at Parker Center on the ground that the arresting officers violated rule 5 of the Federal Rules of Criminal Procedure (18 U.S.C.), by having defendants placed in custody for the purpose of obtaining inculpatory statements, rather than taking them directly for federal arraignmentand that violation also amounted to violations of defendants' Fourth Amendment rights to a prompt determination of probable cause following arrest.
The trial court denied the motion, finding the Federal Rules of Criminal Procedure did not apply to state prosecutions and, moreover, the FBI and LAPD officers did not collude to violate defendants' Fourth Amendment rights. Rather, both agencies were legitimately pursuing their separate investigations, albeit while cooperating and working together. The court found that during the joint arrest and search operation, the LAPD officers had been assigned the responsibility of initially transporting defendants to Parker Center after their arrests, with the understanding that federal agents would transport defendants from there to the nearby federal facility for arraignment. As such, there was nothing nefarious about the fact that the federal agents *1079 and state officers pursued their separate investigations while waiting for the United States Marshals to arrive. The court pointed out that no coercive tactics were applied; all questioning ceased when defendants invoked their right to counsel.
(7) The constitutional provision here at issue is the Fourth Amendment's requirement of "a timely judicial determination of probable cause as a prerequisite to detention." (Gerstein v. Pugh (1975) 420 U.S. 103, 126 [43 L.Ed.2d 54, 95 S.Ct. 854] (Gerstein).) However, in Gerstein, the high court "stopped short of holding that jurisdictions were constitutionally compelled to provide a probable cause hearing immediately upon taking a suspect into custody and completing booking procedures." (County of Riverside v. McLaughlin (1991) 500 U.S. 44, 53 [114 L.Ed.2d 49, 111 S.Ct. 1661] (McLaughlin).) Instead, acknowledging "the burden that proliferation of pretrial proceedings places on the criminal justice system" and recognizing the costs of "introducing further procedural complexity into an already intricate system," the Supreme Court "left it to the individual States to integrate prompt probable cause determinations into their differing systems of pretrial procedures." (Ibid.) That is, while "the Fourth Amendment requires every State to provide prompt determinations of probable cause ... the Constitution does not impose on the States a rigid procedural framework. Rather, individual States may choose to comply in different ways." (Ibid.)
The Fourth Amendment's prompt presentment guarantee is designed to protect citizens from prolonged police detentions without a neutral magistrate's determination of probable cause for arrest because a state "has no legitimate interest in detaining for extended periods individuals who have been arrested without probable cause." (McLaughlin, supra, 500 U.S. at p. 55.) At the same time, however, the high court recognizes a state's "strong interest in protecting public safety by taking into custody those persons who are reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial determination of probable cause." (500 U.S. at p. 52.) Balancing those competing concerns, the Supreme Court held that a "jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein." (McLaughlin, supra, 500 U.S. at p. 56.) The 48-hour safe harbor is presumptive, not conclusive. A timely "hearing may nonetheless violate Gerstein if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility." (McLaughlin, supra, at p. 56.)
*1080 (8) As our summary of the facts adduced at the suppression hearing makes clear, there was nothing indicative of a Fourth Amendment violation. Defendants' federal probable cause hearing took place well within 24 hours of their arrests. More importantly, defendants overlook the fact that they had been arrested pursuant to a federal warrant. The Gerstein/McLaughlin line of cases responds to constitutional concerns present in warrantless arrests. As the Gerstein court explained, "Maximum protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, but such a requirement would constitute an intolerable handicap for legitimate law enforcement. Thus, while the Court has expressed a preference for the use of arrest warrants when feasible, [citations], it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." (Gerstein, supra, 420 U.S. at p. 113.) Of course, persons like defendants who were "arrested under a warrant would have received a prior judicial determination of probable cause."[16] (420 U.S. at p. 116, fn. 18.)
In any event, as the trial court's well-supported findings demonstrate, none of the three factors potentially indicative of unreasonable presentment delay was present here. Defendants assert the recorded conversation amounted to an unreasonable delay "for the purpose of gathering additional evidence to justify the arrest." (McLaughlin, supra, 500 U.S. at p. 56.) But, again, that overlooks the fact that defendants had been arrested on federal charges pursuant to a federal warrant. There was thus no need for additional evidence to justify those arrests. The only additional investigative efforts defendants point to were those by the LAPD officers to investigate potential murder charges under state law.
(9) We turn to defendants' contention that their custodial statements were admitted in violation of the Fourth Amendment because of supposed violations of federal procedural requirements, specifically rule 5(a) of the Federal Rules of Criminal Procedure (18 U.S.C.) and title 18, section 3501(c) of the United States Code, which codifies the currently applicable version of the McNabb-Mallory rule (McNabb v. United States (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608]; Mallory v. United States (1957) 354 U.S. 449 [1 L.Ed.2d 1479, 77 S.Ct. 1356]). This contention fails because, as is well established, rule 5 and section 3501 apply only to federal prosecutions.
*1081 Federal Rules of Criminal Procedure, rule 5(a)(1)(A) (18 U.S.C.) provides: "`A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge ....'" (Corley v. United States (2009) 556 U.S. ___, ___ [173 L.Ed.2d 443, 129 S.Ct. 1558, 1563].) As the federal Supreme Court recently explained, that rule was the product of joint action by the Judicial Conference of the United States and Congress, with the purpose of "pull[ing] the several statutory presentment provisions together in one place." (Id. at p. ___ [129 S.Ct. at p. 1562].) The related statutory provision, 18 U.S.C. section 3501, was intended to "modif[y] McNabb-Mallory without supplanting it. Under the rule as revised by [section] 3501(c), a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was `reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate]'). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was `made voluntarily and ... the weight to be given [it] is left to the jury.' [Citation.] If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the confession is to be suppressed." (Corley v. United States, supra, at p. ___ [129 S.Ct. at p. 1571].)
The Federal Rules of Criminal Procedure are only applicable to the federal courts and do not apply to state court proceedings: "These rules govern the procedure in all criminal proceedings in the United States district courts, the United States courts of appeals, and the Supreme Court of the United States." (Fed. Rules Crim. Proc., rule 1(a)(1), 18 U.S.C.; Spry v. Oberhauser (9th Cir. 1966) 361 F.2d 391, 393 (per curiam) [on federal habeas corpus review arising out of California convictions, the court held the state prisoner's "alleged violation of Rule 5(a) of the Federal Rules of Criminal Procedure is without merit. Said Rules are only applicable to federal courts."].) The same is true of section 3501 and the McNabb/Mallory rule. "Under the leadership of this Court a rule has been adopted for federal courts, that denies admission to confessions obtained before prompt arraignment notwithstanding their voluntary character. [Citations.] This experiment has been made in an attempt to abolish the opportunities for coercion which prolonged detention without a hearing is said to enhance. But the federal rule does not arise from constitutional sources. The Court has repeatedly refused to convert this rule of evidence for federal courts into a constitutional limitation on the states." (Brown v. Allen (1953) 344 U.S. 443, 476 [97 L.Ed. 469, 73 S.Ct. 397], overruled on other grounds in Townsend v. Sain (1963) 372 U.S. 293 [9 L.Ed.2d 770, 83 S.Ct. 745]; see United States v. Carignan (1951) 342 U.S. 36, 41 [96 L.Ed. 48, 72 S.Ct. 97] [the McNabb rule is "a judicially created federal rule of evidence"].) Indeed, by its terms, section 3501(c) applies only *1082 to a "criminal prosecution by the United States or by the District of Columbia ...." (18 U.S.C. § 3501(c).) As the Supreme Court has made clear, section 3501(c) is "the statute governing the admissibility of confessions in federal prosecutions."[17] (United States. v. Alvarez-Sanchez (1994) 511 U.S. 350, 351 [128 L.Ed.2d 319, 114 S.Ct. 1599] (Alvarez-Sanchez).)
Defendants' reliance on cases arising out of federal prosecutions, such as Alvarez-Sanchez and Anderson v. United States (1943) 318 U.S. 350 [87 L.Ed. 829, 63 S.Ct. 599] (Anderson), is therefore misplaced. The fact that defendants were arrested on federal charges and initially placed in federal custody prior to arraignment on federal charges did not make their subsequent prosecution in state court on state murder charges a federal prosecution, subject to nonconstitutional, federal rules. Defendants nevertheless argue the reasoning in those cases applies to their state prosecution. In Alvarez-Sanchez, the high court adverted to a hypothetical violation of title 18, section 3501 of the United States Code"if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment." (Alvarez-Sanchez, supra, 511 U.S. at p. 359.) Pursuant to Anderson, "a confession obtained during such a period of detention must be suppressed if the defendant could demonstrate the existence of improper collaboration between federal and state or local officers." (Alvarez-Sanchez, supra, at p. 359.)
In Anderson, "a local sheriff, acting without authority under state law, arrested several men suspected of dynamiting federally owned power lines during the course of a labor dispute and allowed them to be interrogated for several days by agents of the [FBI]. Only after the suspects made confessions were they arrested by the federal agents and arraigned before a United States Commissioner. We held the confessions to be inadmissible as the `improperly' secured product of an impermissible `working arrangement' between state and federal officers." (Alvarez-Sanchez, supra, 511 U.S. at p. 359, fn. 4, quoting Anderson, 318 U.S. at p. 356.) Nothing remotely similar occurred in this case. Defendants were arrested pursuant to a legitimate federal warrant; federal and state officers ceased questioning immediately upon defendants' invocation of their right to counseland the challenged statements were not only voluntarily made, but offered in a subsequent state prosecution.

*1083 Prosecutorial Misconduct

Defendants contend the prosecutor engaged in prejudicial misconduct in opening statement and closing argument. As we explain, the challenged statements do not warrant reversal.
At the start of her opening statement, the prosecutor referred to the plight of the homeless persons who, unlike most citizens, "don't have to worry about where our next meal will come from" or "where we're going to sleep or ... bathe." Counsel for Rutterschmidt objected on the ground that the references to homelessness improperly appealed to the jurors' passions or prejudices. The court overruled the objection. The prosecutor continued by stating that the evidence would show defendants preyed upon the weaknesses of their homeless victims for personal profit.
The prosecutor began her closing argument by stating: "[D]efendants made $600,000 on the life of ... Vados. They collected their profit and they buried .... Vados in an unmarked grave. They took a man who, through human circumstances, lost his family and made that loss permanent to his daughter .... They did not care for ... Vados in life or in death. They sought only profit. [¶] They made $2.2 million on the life of Kenneth McDavid. They took their profit, they cremated his remains. And to this day, his remains are unknown to his family." Counsel for Golay objected and requested a mistrial on the grounds that the statements concerning McDavid's cremated remains had no basis in the record and they were calculated to inflame the jurors' passions and prejudices. The trial court denied the mistrial motion. When the argument resumed, the prosecutor repeated the challenged statements regarding McDavid's remains, arguing that defendants "did not love ... McDavid or care for him in life or in death. They sought only profit."
(10) Prosecutorial misconduct rises to the level of a constitutional violation where the misconduct so infects the trial as to result in a denial of due process. (People v. Hill, supra, 17 Cal.4th at p. 819.) Prosecutorial misconduct under state law exists if the prosecutor uses deceptive or reprehensible means to persuade the court or jury. (Ibid.; People v. Samayoa (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) However, "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (People v. Thornton (2007) 41 Cal.4th 391, 454 [61 Cal.Rptr.3d 461, 161 P.3d 3], citing People v. Ayala (2000) 23 Cal.4th 225, 284 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Defendants forfeit claims regarding conduct to which they did not object at trial, and reversal will not lie where a timely *1084 objection and request for admonition would have cured any resulting harm. (See People v. Thornton, supra, at p. 454, citing People v. Farnam (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].)
Here, with regard to the challenged statement during the prosecutor's opening, only Rutterschmidt objected and in doing so failed to request an admonition. Accordingly, that claim was not preserved for appeal. The futility exception set forth in People v. Hill, supra, 17 Cal.4th at pages 820-821 does not apply because nothing in the record indicates the trial court discouraged either defense counsel from requesting admonitions or for joining the other's objections. Only counsel for Golay objected to the prosecutor's closing argument reference to the disposal of McDavid's remains. The fact that the trial court denied counsel's mistrial motion did not render futile a request for a curative admonition, as the standard for granting a mistrial motion is significantly different.
Had the issue been preserved, we perceive no misconduct in either statement. The references to homelessness in the opening statement were not gratuitous, but relevant to the prosecution case and supported by witness testimony. Witnesses Pastor Suhayda, Covington, Lamay, and Crapeau offered testimony as to the severe financial difficulties of defendants' intended victims and that defendants' interest in homeless persons was not eleemosynary, but mercenary. Indeed, the prosecution presented overwhelming evidence that their murder conspiracy depended on finding homeless victims. With regard to Rutterschmidt's assertion that there was no evidence in the record as to Vados's homelessness, we point out that it was uncontradicted that Vados had no means of support at the time defendants paid his rent and he was killed. In addition, from Pastor Suhayda's testimony that Vados, Covington, and McDavid all participated in his church's programs for the homeless, combined with the testimony that one or both defendants used the church to recruit McDavid and Covington as potential victims, it would have been reasonable to infer that defendants did the same with regard to Vados.
(11) Golay argues the references to the manner in which Vados's and McDavid's bodies were disposed were gratuitous, serving no purpose other than to inflame the jurors' passions against defendants and their sympathies in favor of the victims' survivors.[18] We see no substantial likelihood that the statements would improperly sway the jurors who had been instructed that the attorneys' comments were not evidence and that they must not be influenced by pity or prejudice against either defendant."`[It is] the almost invariable assumption of the law that jurors follow their instructions.' [Citation.] `[We] presume that jurors, conscious of the gravity of their task, attend *1085 closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' [Citations.]" (United States v. Olano (1993) 507 U.S. 725, 740 [123 L.Ed.2d 508, 113 S.Ct. 1770]; see People v. Romo (1975) 14 Cal.3d 189, 195 [121 Cal.Rptr. 111, 534 P.2d 1015]; People v. Sisneros (2009) 174 Cal.App.4th 142, 152-153 [94 Cal.Rptr.3d 98].)
Here, in light of the overwhelming evidence as to defendants' coldbloodedness and lack of remorse in committing crimes that bespoke a complete lack of compassion for their victims, there is no reason to think any perceived callousness with regard to the manner in which they had the victims' bodies disposed of would have affected the jury's deliberations.

Jury Instruction
(12) Rutterschmidt contends the trial court violated her Sixth Amendment right to a unanimous jury and due process by its instruction to the jury upon the seating of an alternate juror after the jury had reached a partial verdict. Although styled as a claim of federal constitutional error, Rutterschmidt's claim is premised on a purported violation of the California Constitutionthe requirement under People v. Collins (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742] (Collins) that upon the seating of an alternate juror, the court must "instruct the jury to set aside and disregard all past deliberations and begin deliberating anew." (Id. at p. 694.) The Collins rule was crafted to give effect to article I, section 16 of the state Constitution, which mandates that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous. (Collins, at p. 693.) In People v. Renteria (2001) 93 Cal.App.4th 552, 558-559 [113 Cal.Rptr.2d 287] (Renteria), the court noted that the state high court in Collins "was careful to ground its ruling on the jury trial provision of the state Constitution, article I, section 16, rather than on the federal Constitution."
Rutterschmidt was charged with Vados's murder and conspiracy to murder him in counts 1 and 2. Counts 3 and 4 were the murder and conspiracy charges as to McDavid. (Golay was similarly charged in counts 5-8.) During deliberations, the jury indicated that it had reached verdicts on all counts except counts 1, 2, and 3. The trial court took the verdicts on counts 4 through 8. After additional argument, the jury reached a verdict on count 3, but informed the court that it could not reach a verdict on counts 1 and 2. The trial court took the verdict on count 3. After doing so, the trial court excused one of the jurors for hardship reasons. There was no objection. (See, e.g., People v. Thomas (1990) 218 Cal.App.3d 1477, 1488 [267 Cal.Rptr. 865] ["the trial court did not abuse its discretion when it received the jury's partial verdict knowing that one of the jurors later would be excused from the panel for good cause"].)
*1086 An alternate juror was chosen as a replacement, and the trial court instructed: "A juror has been replaced by an alternate juror. You must not consider this fact for any purpose. [¶] The People and the defendant have the right to a verdict reached only after full participation of the 12 jurors who return the verdict. [¶] This right may be assured only if you begin your deliberations again from the beginning. [¶] You must therefore set aside and disregard all past deliberations. And what I'm talking about is with respect to Counts 1 and 2 since those are the only two counts that remain. [¶] So you therefore must set aside all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place." The trial court modified CALJIC No. 17.51 by adding the italicized language.
It is Rutterschmidt's claim that the trial court's modification violated the Collins rule that the jury must set aside and disregard all past deliberations and begin deliberating anew. By limiting the scope of deliberations to counts 1 and 2, Rutterschmidt argues, the trial court effectively required the jury to consider the facts of the McDavid murder and conspiracy as being conclusively proved against her. Because the prosecution's theory was that defendants' conduct in committing the McDavid murder conspiracy tended to prove guilt for the Vados crimes, Rutterschmidt asserts the trial court's modification to CALJIC No. 17.51 prevented the reconstituted jury from engaging in renewed deliberations as to a substantial and important aspect of the prosecution's case on the remaining counts.
This contention fails because nothing in the trial court's instruction would have caused a reasonable juror to believe any factual matter had been established for purposes of the remaining counts. Under a fair reading of the instruction as a whole, the trial court's modification merely (and accurately) informed the jury that only two counts remained subject to deliberation. It did not purport to limit the scope of the jury's factual inquiry. "[S]ince the admonition requirement is imposed as a function of the state Constitution rather than federal law, error is tested by the standard of People v. Watson [(1956)] 46 Cal.2d 818, 836 [299 P.2d 243]: it is reversible only if it is probable that the defendant would have achieved a better result but for the error. (Collins, supra, [17 Cal.3d] at p. 697, fn. 5.)" (Renteria, supra, 93 Cal.App.4th at p. 559.) Here, the alleged error would have been harmless whether assessed in terms of Watson, or the harmless-beyond-a-reasonable-doubt standard for federal constitutional error under Chapman v. California, supra, 386 U.S. at page 24: There was no reasonable probability the jury would have understood and applied the instruction in the manner he argues. As there was no error under Collins, Rutterschmidt's Sixth Amendment and due process claims necessarily fail. (E.g., People v. Ayala, supra, 23 Cal.4th at p. 253 ["There was no violation of state law, and because defendant's *1087 constitutional claims are predicated on his assertion that state law was violated, they too must fail."].)

DISPOSITION
The judgments are affirmed.
Armstrong, Acting P. J., and Mosk, J., concurred.
NOTES
[1] All statutory references are to the Penal Code, unless otherwise stated.
[2] See Insurance Code section 10113.5.
[3] According to Officer Nicholas Orozco, on April 1, 1998, at 11:30 p.m., Rutterschmidt had telephoned the police department to report Vados as a missing person. At that time, Rutterschmidt gave the South Fedora Street residence as his last known address and said he went missing on March 27, 1998. His mental condition was "poor and disoriented."
[4] At the time of his testimony, Lamay was serving a prison term in Michigan for a 2005 criminal sexual conduct conviction.
[5] Pastor Charles Suhayda testified that he met Vados and McDavid through their participation in the church's program for homeless and low-income persons.
[6] Detective Dennis Kilcoyne testified that a postarrest search of Golay's Mercedes recovered a day planner with a Post-it note on one page with a partial license plate number (FYR 482).
[7] The cell phone number used was assigned to Golay's daughter.
[8] Golay had made another application for life insurance on McDavid on March 11, 2004, in the same manner as the previous one. The policy was not issued because of irregularities in the application.
[9] Pastor Suhayda met Covington, as well as Vados and McDavid through their participation in the church's programs which all three regularly attended. In March or April of 2006, Pastor Suhayda was introduced to defendants when they had a short conversation with him after a Sunday meal for the homeless and poor.
[10] Defendants rented an office in the building. The rent was paid by checks drawn on Golay's bank account.
[11] The Supreme Court issued Melendez-Diaz on June 2, 2009, after initial appellant briefing was complete. However, both appellate counsel had referenced the pending decision in their briefing (as had the Attorney General). We granted the request from Golay's counsel to submit supplementary briefing on the opinion's application to this appeal.
[12] In her appellate reply brief, Rutterschmidt asserts for the first time that her trial counsel rendered ineffective assistance by failing to preserve the confrontation clause claim. "Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (American Drug Stores, Inc. v. Stroh (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432].) In any event, the confrontation clause claim fails on the merits.
[13] Melendez-Diaz does not affect the forfeiture aspect of our ruling as to Rutterschmidt. There, the defendant timely objected to the certificates' admission on the ground that the confrontation clause "required the analysts to testify in person." (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2531].)
[14] "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as rule 5(c) provides, unless a statute provides otherwise." (Fed. Rules Crim. Proc., rule 5(a)(1)(A), 18 U.S.C. italics added.)
[15] Defendants were subsequently arraigned in state court on March 29, 2007.
[16] Defendants' situation is, thus, easily distinguished from that in People v. Jenkins (2004) 122 Cal.App.4th 1160 [19 Cal.Rptr.3d 386]. There, the court found a Fourth Amendment violation where the defendant was arrested without a warrant for driving without a license, a misdemeanor offense, and "detained for over 16 hours and never brought before a magistrate for an independent determination of probable cause" so the police could investigate his involvement in a shooting incident. (122 Cal.App.4th at p. 1175.)
[17] Even if the federal statute were applicable here, it would be unavailing to defendants because subdivision (d) of that same provision states: "Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone ...." (18 U.S.C. § 3501(d).) Here, of course, defendants' potentially inculpatory statements were not the product of any interrogation and there is no claim of lack of voluntariness.
[18] As the Attorney General points out, neither defendant objected to the prosecutor's statements concerning the disposal of Vados's body.